The next case for argument is 13-1586 Southern Snow Manufacturing v. SnoWizard Holdings Now, before we begin, Mr. Morris, I'm advised that you came to court a little late and therefore our court was unable to ascertain a split in time that is across the field here. You've got 15 minutes in total. Did you want to use this? I believe I have designated 11 minutes and reserved for the rebuttal. Okay. Got it. Thank you. Mr. Andrews May it please the court, I'm Mark Andrews representing nine plaintiffs, seven real parties in interest, that are all in the snowball-shaved-ice business, either the manufacturing, distributing, or retail level. We're asking for this court to declare one patent invalid as a matter of law under the on-sale bar, section 102. We're asking for this court to allow retrial of the matter of invalidity of a second patent where the application was abandoned for 20 months after allowance. And where the defendant's patent expert testified about the petition to reinstate that patent application even though it was not in her expert report. We're also asking for this court to reinstitute several unfair competition claims under Louisiana state law and the Lanham Act and civil recode claims that were tossed out on interlocutory orders and not tried. And in the antitrust claim where we did prove to the jury's satisfaction that there was anti-competitive conduct with specific intent and we did establish a market for snowball supplies. You mentioned civil recode. Yes, Your Honor. And there's a Rule 11 challenge here. And Rule 11 requires an attorney to certify that an assertion is warranted by existing law or there's a non-frivolous argument for establishing new law. Is there any law holding that making a patent infringement claim or a trademark infringement claim constitutes a violation of the legal act? Yes, there is a law which is the Bridge v. Phoenix Bond and Indemnity Company decision which supports these recode claims. A decision of what tribune? The U.S. Supreme Court. And we contend that the Bridge v. Phoenix Bond and Indemnity decision overrules the semiconductor electronics decision from 2006 from this court that said that fraud upon the patent and trademark office… But this is assertion of a claim that someone with a patent is entitled to make, namely that you infringed my patent. Yes, Your Honor. And the defense to that is that I'm not infringing or that it's invalid. The civil recode claims were based on fraud upon the patent and trademark office in getting the claims. So, it's essentially a Walker process set up where the patents and the trademark registrations were gained by making material misstatements to the patent and trademark office. But there's a remedy for that, an enforceability. Not a recode claim, but increased damages and attorney fees. There are varying opinions about civil recode and what it does and does not cover. But none relating to assertion of patent infringement. Only the semiconductor electronics case from this court that was overruled by the Supreme Court in Bridge v. Phoenix Bond. You were trying to establish a new point of law, as I understand it. A clear new point of law. You're arguing on the basis of a reversal of one of our opinions that you say opens some daylight for you to be able to non-frivolously make an allegation. Yes, Your Honor. And you might lose, you might win, right? That's what happens. Yes, well, I had also the support of the Fifth Circuit that had already recognized that Bridge had overruled the former requirement in the Fifth Circuit. And ironically, that was a case that I handled. My understanding is that the Rule 11 charge against your client on the basis of frivolously bringing a recode claim, that request for relief was denied without prejudice. And my recollection is that a new claim is filed. Is that correct? Maybe I'm wrong. A second case was filed, a civil recode based on instructions. I thought the sanctions request. I think what Judge Lurie is referring to is the cross-appeal on sanctions. Yes, they filed several motions for sanctions against me, essentially. They filed a lawsuit in state court against me. Well, there have been a lot of lawsuits filed. So, you want to bring back some of the recode claims, some of the antitrust claims. You started with 220 claims in this case. That's what they say. Well, how many do you say? Well, there were claims against 20 trademarks on flavor names and two patents. And the 20 trademarks were in different stages of having been registered, applied for registration. Some of the registrations were held up because we were able to file oppositions. I just ask you a fairly straightforward question. How many essentially left? A number. You said, no, that's what they say, 220 or 200 remaining. What is still in play? I know a lot of them are gone, but you're appealing that we resurrect some of those. Yes, Your Honor. For each of those 20 trademarks, we filed Lanham Act unfair competition, Louisiana unfair competition. For the ones that had been approved for registration, we filed under Section 1120, or Section 38 of the Lanham Act. And so, basically, 20 times 5. Before your time runs out, can you talk to us a little about the unsealed bar issue that you're pressing here? Yes, ma'am. The documents show unquestionably that the technical drawings existed and the testimony is that the part was perfected in the machine shop and that the finished part was given to an architect who created the technical drawings. This was because the contract manufacturer, they originally sent the prototype, the perfected prototype, to the contract manufacturer who said, no, send us drawings. That's the way that we work. And, of course, the technical drawings, the existence of them, are important under FAF. And the contract manufacturer, PMI, two years before the first patent application, before the critical date, just sent back quotations based on those detailed technical drawings. But the jury heard all of this back and forth and they heard the witnesses and they heard what went down. I know this is ultimately a question of law. These are underlying facts in terms of who did what when and what was the state of what was being done. Don't you think you have a fairly high road to get that reversed to the state? No, Your Honor, because the jury was misled by a story that the part was not the patented invention. It was only after the two component pieces of the part had been joined together and put into an ice shaving machine that the patented invention came into being. And, A, that's not the case. And, B, there's a letter, January 2nd of 2002, that says that Snow Wizard took the sample parts that the contract manufacturer had sent to them, had put them together, assembled them, had put them into an ice shaving machine, and were sending the parts and several components of the machine back to the contract manufacturer. In response to the Chief Judge's question, my understanding of your appeal on patent issues is that you think this is one of those cases that happened from time to time when no reasonable juror could have reached any conclusion other than that the patent is invalid for on sale bar. That's standard J. Moll, and you made that. I've got the J. Moll record from the court, and you made that J. Moll motion. Yes, Your Honor. And the judge denied that on the grounds, oh, well, there was nothing actually shipped until after the critical date. Right? If you look at the rationale of the judge in responding, your J. Moll motion was pretty specific. It was what you've said. It was evidence of there was a request for manufacture of the parts. The parts were the same. There's no question about them being the parts that need to go together, and there's evidence of it going together. And there's no evidence to controvert of them going together. So how can you have any other conclusion, right? Yes, Your Honor. The judge said, oh, I'm going to deny the J. Moll because there's no proof that the combined product was shipped. Yes, Your Honor. Even though the shipping is irrelevant, right, it's an offer for sale, not a sale. Yes, Your Honor. That's what I understood. And the October 2002 order was a reorder. Senator Hicks. Your Honor, if I don't want to sit down for the time being, we'll hear from Mr. Morris. We'll hear from Mr. Morris. Many of the arguments on appeal raised by the appellants are challenging the disputed factual findings of the jury. And appellants do not establish that any of these findings were clearly erroneous. All of the findings were based on the jury's determinations of credibility of witnesses and numerous fact witnesses, expert witnesses, lots of exhibits, lots of testimony. The jury's findings reflect the plausible view of all this evidence. And, you know, for these reasons, these factual findings are not, cannot be clearly released. Why isn't PMI's quote from January 17, 2002, a commercial offer for sale? Was that the one where they, well, it is not a commercial offer for sale because the components had not even been finished at that point. There were two components, the SW1, I believe, and SW2. One of them was, all of this was a process. It took a lot of time to develop the first part. And the process was... Is there any argument that the component is any way different from what's shown in the drawings? I believe, yeah, I believe it was refined... Testimony? I didn't see a testimony. It was refined considerably in terms of when these parts were fabricated and the test parts were sent to Mr. Scortino. He examined them, he made modifications. There are, you know, communications between Mr. Scortino and PMI reflecting these modifications that were made. The jury saw all of this, heard all of this, and determined, based upon, you know, the law as instructed to them, that this was not a commercial offer for sale. These were not, the invention was not on sale during this time. And it wasn't until about a month before that final shipment that the final fabricated SW2 part, the second part, was even a sample of two parts. Sample parts were sent to Mr. Scortino like in December of 2002. There's no way there could have been any commercial offer or sale or public use of that product before he had even seen the samples that had been initially fabricated. And then he had to, you know, inspect those samples, make whatever changes, and... Well, what aspect of the claims is missing if you have the two component parts, the SW1 and the SW2? The claims, I think claim number one is for a cam assembly comprising this ratchet linkage and a... I forget what it's... it's the tooth part of the thing that the ratchet linkage operates in connection with. There's another claim which describes an ice shaving machine comprising the machine and this cam assembly. So that claim, I believe it's claim eight, does cover the entire machine. Claim one covers the cam assembly including these parts, a pin that connects them, which was never manufactured, fabricated, or anything by PMI. All PMI fabricated were the two separate component parts that had to be assembled and then assembled onto the machine and this ratchet bar that controls the... Did they offer to sell an assembly consisting of a cam connector and a cam member? They did, but they did not offer to sell those other than in the context of the experimental fabrication. First of all, I believe in order for there to be an offer of sale, commercial offer of sale, the invention has to be reduced to practice. And again, the first samples of these parts were not even fabricated... of part two was not even fabricated until December of 2002. After all of these events... What's the critical date? February of 2003. So it was manufactured before the critical date. Well, but these were experimental. This was the part number SW2 that had to be inspected and still these parts were not assembled in the manner described in the patent. What about your adversary's argument to the contrary that you guys did assemble? Excuse me? You heard what your adversary said about the assembly? No, they were not assembled until at least March of 2003. And then you said it had to be inspected. Is that the basis upon which this would be called experimental and not reduced to practice? Well, it's not only inspected, but any modifications... This is a... I forget what it's called. These are steel or metal parts and there has to be a mold. And so then some samples of these are made and sent to Mr. Scortino to make sure that they work, that they fit together, that they perform as envisioned. And that did not happen until December of 2002, which required further... Again, before the critical date. That was before the critical date, but there was no final sale of any product before the critical date. Or offer. Or offer a sale. Can I turn to the question of this orchid cream vanilla thing, this argument you make? I couldn't find any records where you made the argument about and raised the consent judgment with regard to this issue. And then correct therefore that it wasn't raised below and it was just something that you're raising here on appeal for the first time. I don't believe it was raised in the motion for judgment as a matter of law filed after. But it is a judgment which establishes that this term is generic. Well, it's generic for flavorings. For flavorings and flavor concentrates. No, but not for a snow cone. Food flavor. But the mark that's being asserted against you in this claim is for the cone, not for the concentrate. They have a mark on this name for the snow cone that you get. And why is it that a mark for a concentrate or a food flavoring is the same as a mark for the cone? Well, I don't know whether there's anything special about the orchid cream vanilla when you put it on the cone as opposed to concentrate. It's very, very concentrated, right? Strong stuff, nobody would possibly touch it raw. So it gets highly concentrated to go in an ice cone. Yes, sir. So it's a different product. So there's marks on different products. There's a consent judgment with regard to the concentrate and the food flavoring, but not with regard to the product. Well, the product is a food flavoring that is poured on the snow cone. The term is orchid cream vanilla flavored snow cone. The snow cone itself is not called an orchid cream vanilla. What's the trademark on it? The registered trademark. The mark on flavoring? Or the mark on a product, on a cone? All these marks. A pearl ball on the cone. Is that a mark on the cone? Yes. It's not a mark on the cone. It's a mark on the flavor applied to the cone. You got one of the proposed registrations on the cones? Well, Snow Wizard had a registration on it for flavoring concentrates for shaved ice confections. So that's the concentrate. A shaved ice confection. Shaved ice confection. So the question then would be, is a mark for a shaved ice confection the same as a mark for a concentrate? Well, the concentrate for shaved ice confections, yeah, the mark was on that. That has been canceled, that mark, the registration. Plum Street Snowballs uses orchid cream vanilla to describe the flavor of a particular... If you had a trademark for a bumper of a car and a trademark on the hood of the car and the trademarks were the same, and a consent was entered into that the trademark on the bumper was generic, does that mean the hood's generic? I can't really make that analogy. Well, that's the one I'm asking. Because there's a difference between the shaved cone. I guess it would depend on what the consent judgment in that case said in terms of what is generic for use. Right, but the consent judgment here could very easily have covered the shaved ice confection, which is the cone. But it didn't. It only covered concentrates and food flavors. And here it's being used as a food flavoring. Can I ask you a question on your cross-appeal on the Rule 11 sanctions? My understanding is that you feel that the district court judge erred in not granting you the sanctions. Is that correct? Yes, Your Honor. Now, my understanding, which I didn't articulate very clearly when your adversary was out, is that your motion for sanction was denied without presence, A2887? Correct. On the grounds that the judge didn't know, couldn't reach the conclusion. It would be premature for me to conclude. And allowed you, by giving you the dismissal without presence, to refile. My understanding is that your claim has been refiled, but hasn't been adjudicated. Yes. So is the Rule 11, what's the basis for a cross-appeal on the initial denial? Is the issue still alive? Well, because my concern was that if we had not appealed it, then the denial would be final. But, I mean, it's premature. I mean, you're asking us to address the merits of whether the trial judge was correct in failing to come to the conclusion that the filing of the original claim was a sanctionable under Rule 11. The judge himself has said, herself has said, I'm not prepared to make that decision. And our position on that. Why isn't it prudent for us to note that you have filed this appeal for whatever preservation purposes you felt was necessary, but that it's premature for us to consider it? It's like an advisory opinion, because the judge has said, I don't have a rationale to give you on Complaint 1, so I'm dismissing it without prejudice. Well, part of the motion for Rule 11 sanctions is based on a pure, objective issue of law, which is whether there was a basis in law for the claims made. It's not something that would require a trial to determine whether or not it would be done. So you'd rather have us not reach the issue than determine the judge was correct on the merits, when she didn't even say it was on the merits, right? Because if we were to rule that the judge was correct in not granting the Rule 11 motion as a matter of law, then you're out of luck on what's pending. You may have asked for more than you want. Well, just to pile on, the standard of review is an abuse of discretion. What we're reviewing here is whether or not this particular judge abused her discretion by saying that she cannot do it at this time in light of the pending motion. That would be really hard to say, would it not? Except that the standard of review of the Rule 11 motion was not applied by the judge. So to that extent, I believe the judge is erroneous. And the implication of that is that we have had to, since then, have to suffer through no less than five more RICO complaints based on the same allegations. Five new ones? Five, like an amended one in this case, and four other ones in other different cases that have been filed repeatedly. That was part of the duplicative claims that were dismissed by the judge on our motion for summary judgment of duplicative claims, that even the judge found that there was no other explanation for this repeated filing of duplicative claims than to basically subvert the procedural rights of the parties and to harass Snowerson. Aren't there pending other lawsuits? This appeal, peace isn't coming to the kingdom in the Snow World, is it? There's one other one that I believe has been pretty much disposed of at this point. And so I think we're hopefully near the end. As I do. Time's up. Yes, thank you. The repeated filings in this consolidated litigation was responses to continuing and escalating filings of applications for trademark registration and new misbehavior and not just filing the same lawsuit several times. Fifth Circuit law applies to the civil RICO claims that are based on trademark, misbehavior with regard to trademarks. And the St. Germain v. Howard case in the Fifth Circuit explicitly recognized that Bridge v. Phoenix Bond and indemnity calling for a proximate cause analysis overruled the then existing Fifth Circuit law. And so when I filed the civil RICO claims, I had that St. Germain v. Howard lawsuit backing me up that this could be a civil RICO claim. And I also had an expectation that Bridge v. Phoenix Bond and indemnity would overrule the semiconductor electronics case in the Federal Circuit. I've identified by a 28J letter the Supreme Court's Lexmark International v. Static Control, which addresses the issue here. And your citation of that initial authority was towards this RICO issue you're talking about? I was having trouble figuring out exactly what the citation of initial authority, what point it was going to. I'm sorry, I was too brief in writing the letter. It explicitly controls the dismissal of all of those unfair competition claims. We had unfair competition claims. They were dismissed on interlocutory orders. Is that part of your antitrust argument? The unfair competition arguments fall under Lanham Act, or where are they falling? Unfair competition was Lanham Act, yes, Your Honor. And it was not only Lanham Act Section 43A, unfair competition, but it was Section 38 for fraudulent procurement of a trademark. Those were all thrown out early. A741 is the January 3rd letter of 2002 that says that they assembled the pieces. And I'm out of time. January what day? January 3rd, 2002. You can take another 30 seconds because I'm about to offer your friend an extra minute for his cross-appeals. And that's before the critical date? It's a year before the critical date. And it says that they received the samples, they machined them, they put them together, they worked out well, there's a couple of minor adjustments. Do you have a record site for that? A741. A741, thank you. Yes, Your Honor. Now, Mr. Morris, you exhausted all of your time. I'm willing to give you an extra minute if you think it's necessary. It would help, Your Honor. Okay. Thank you. Going back to the Orchid Cream Vanilla issue, as Your Honor... Well, I don't think your friend really responded to anything in regard to that aspect of the cross-appeals. So I don't think you need to have extra time for that. Okay. His reliance upon the Lexmark case is overstated because I don't believe the Lexmark case controls anything having to do with this case. The issue in that one was whether the plaintiff stated a cause of action under the Lanham Act. And the court held that the plaintiff had alleged sufficient facts to support a Lanham Act claim, but that the plaintiff still had to produce evidence to prevail on those claims. In this case, the appellants had many opportunities to present that evidence. The interlocutory orders they're complaining about were summary judgments dismissing them for failure to produce evidence. Thank you. We thank both parties for taking the time. Thank you.